UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

ROBERT WINBURN a/k/a SCOTT LIBBY,
Prisoner No. 222196,

    Plaintiff,

v.

MS. HALLOWELL, Resident Unit Officer
of Muskegon Correctional Facility,

    Defendant.
_____/

Case No. _____

1:04CV0562

Hon. _____

**David W. McKeague
U.S. District Judge**

**Timothy P. Greeley
U.S. Magistrate Judge**

PRISONER CIVIL RIGHTS COMPLAINT
BROUGHT UNDER 42 U.S.C. § 1983

I. Previous Lawsuits

1. Plaintiff Robert Winburn a/k/a Scott A. Libby, hereinafter referred to as ("Plaintiff") has begun other lawsuits in federal court relating to his imprisonment. After passage of the Prison Litigation Reform Act, and 28 U.S.C. § 1915(g), Plaintiff is required to list the following actions:

    (1) Docket No. 1:98-CV-242; United States District Court for the Western District of Michigan, Southern Division; Winburn v Howe, dismissed for lack of injury;

    (2) Docket No. 1:98-CV-243; United States District Court for the Western District of Michigan, Southern Division; Winburn v Coles, dismissed finding prisoners have no first amendment right to petition the government for redress of grievances. However, the United States Court of Appeals for the Sixth Circuit recently clarified its position, and found under United States Supreme Court precedent, prisoner's have a first amendment right to petition the government for redress of grievances.

II. Administrative Remedies

2. Plaintiff is incarcerated in the State of Michigan, and has fully exhausted or otherwise complied with the requirement of exhausting his administrative remedies by way of filing a Step I, Step II, and Step III

Grievance against Defendant Resident Unit Officer Ms. Hallowell. (See attached Appendix A, as an offer of proof). It should be noted that as a result of commencing a grievance against RUO Hallowell, Plaintiff was unjustly placed on "Modified Access" status by Warden J. Cason. (See attached Appendix B, as an offer of proof). Warden J. Cason forwarded Plaintiff a Memorandum, which stated that pursuant to "PD 03.02.130, Prisoner/Parolee Grievances, page #6, under the heading of Modified Access, II, states in part, A prisoner or parolee who ... is found guilty of misconduct for filing an unfounded grievance as set forth in Paragraph K, may have access to the grievance process limited by the Warden or FOA Area Manager for an initial period of not more than 90 calendar days". Consequently, Plaintiff was placed on "Modified Access" status from October 15, 2003 to January 15, 2004, and was thereby required to write the Grievance Coordinator asking for permission to file a grievance and obtaining the actual grievance form. Importantly, Plaintiff was **not** issued a misconduct for filing a purported unfounded grievance, since there was no evidentiary support for the bald allegation by the Warden.

3. While Inspector C. Clay is presently not named as a Defendant, Plaintiff does note that he sent a letter request to the Grievance Coordinator on November 17, 2003, (See Attached Appendix C, as an offer of proof), specifically requesting a Step I Grievance as he was required to do since being placed on "Modified Access" status. In the October 10, 2003, Memorandum from Warden Cason, it provided in part: "To obtain permission of the Grievance Coordinator you must first kite the coordinator and state your grievance. If the Grievance Coordinator finds your issue lacks merit he will not send you a grievance form <u>and you will receive no further response in any way on that issue</u>". (See attached Appendix B, as an offer of proof). Consequently,

2

Plaintiff properly deemed the Grievance Coordinator's failure to respond as a denial. Plaintiff has complied with all the terms of Policy Directives, Operating Procedures, and the Warden's Memorandum in attempting to exhaust his administrative remedies with regard to Inspector C. Clay. Any other attempts would be futile where Plaintiff was directly impeded by the unjust placement on "Modified Access" status, and the Grievance Coordinator's ultimate failure to forward a Step I Grievance for processing against Inspector C. Clay.

4. As to Grievance Coordinator M. Brevard, Plaintiff sent a letter request to the Grievance Coordinator on November 22, 2003, (See attached Appendix D, as an offer of proof), specifically requesting either a Step I or Step III Grievance Form so that Plaintiff could pursue a grievance against the Grievance Coordinator himself for staff corruption in failing to forward a grievance form for processing a meritorious grievance against Inspector C. Clay. Again, the Grievance Coordinator refused to reply.

5. It is also noted that Prison Legal Services of Michigan, Inc., Attorney Sandra Girard, Executive Director, conducted an investigation and civil discovery proceedings into Grievance Coordinator M. Brevard's arbitrary treatment of prisoners invoking the grievance process at Muskegon Correctional Facility, and found data that reveals grievances rejected at an alarming rate. (See attached Appendix E, as an offer of proof).

6. For the record, the grievance matters pertaining to Inspector C. Clay, and Grievance Coordinator M. Brevard are irrelevant since they are currently not even named as Defendants in this action.

### III. Statement of Facts

7. Plaintiff Robert Winburn a/k/a Scott Libby was imprisoned at Muskegon Correctional Facility at all times pertinent to this complaint, but is

3

currently incarcerated at Bellamy Creek Correctional Facility at 1727 W. Bluewater, Hwy., Ionia, MI. 48846.

8. Defendant RUO Hallowell is, and was at all pertinent times, a Correctional Officer at Muskegon Correctional Facility, at 2400 S. Sheridan Rd., Muskegon, MI. 49442. She is sued in her individual capacity for damages, and declaratory relief.

9. Plaintiff was convicted on January 9, 1992, pursuant to a jury trial before Judge Thomas E. Jackson of first degree felony murder, assault with intent to commit murder, and felony firearm. On appeal, Plaintiff's first degree felony murder conviction was ultimately vacated and reduced to second degree murder. See People v Winburn, 450 Mich 861 (1995).

10. Plaintiff steadfastly maintained his actual innocence, but his attempts at further post-appeal relief were denied in his state and federal proceedings.

11. In the year 2001, Plaintiff received by way of first class mail a standard manilla legal size envelope containing legal items and postmarked from Detroit, Michigan with a return address from Wayne County Prosecutor's Office, Frank Murphy Hall of Justice, 1441 St. Detroit, Michigan, 48226. Upon inspection, there was a cover letter from an unidentified member of the Wayne County Prosecutor's Office which stated: "Dear Mr. Libby: Enclosed for your review is an example of the underhanded tactics the Detroit Police and certain representatives of our Office engage in all too often. Perhaps you can bring this to the attention of the right people when you are vindicated." Upon Plaintiff's review of the materials therein, Plaintiff found two Internal Memorandums prepared by members of the Wayne County Prosecutor's Office discussing the clear impropriety in the use of professional jailhouse snitches, (See attached Appendix F, as an offer of proof). Furthermore, there

4

was a transcript of a clandestine hearing, which revealed that certain members of the Wayne County Prosecutor's Office (including Attorney General Mike Cox) were involved in the use of professional jailhouse snitches who were granted suppressed sentencing concessions (being Joe Twilly Jr. and Oliver Cowan), involving more than twenty (20) homicide convictions, and in a secret deal, Joe Twilley Jr. was released from custody despite having been validly convicted of a murder. In the words of Judge Shamo, he stated: "I don't want this transcript released to anybody." (See attached Appendix G, as an offer of proof). With said information in hand, Plaintiff wrote numerous letters of complaint, including to the Governor, Wayne County Prosecutor's Officer, Michigan Attorney General, Michigan Civil Rights Commission, and even the Attorney Grievance Commission to no avail.

12. In the year 2001, 2002, and 2003, startling information surfaced, which turned Plaintiff's state court criminal convictions upside down. Specifically, a private investigator named Julianne Cuneo was retained by Plaintiff's family and new information was obtained that established a direct-link between the November 8, 1990 shootings that Plaintiff stood convicted for, and a November 8, 1990 major cocaine bust on former members of the Medellin Drug Cartel of Colombia showing their co-conspirator (Ceasar Vallejo) actively orchestrated the shootings of November 8, 1990 that Plaintiff was convicted for, which was related to their apprehension by the Federal Bureau of Investigation, and Drug Enforcement Administration. (See United States District Court, Eastern District of Michigan, Southern Division, United States v Vallejo, et. al., Criminal File No. 2:90-cr-80952). A fact never known in Plaintiff's initial trial or appellate proceedings.

13. Plaintiff's new evidence of his actual innocence consisted primarily of an affidavit of another man, Timothy W. Taylor, who repeatedly credibly

5

confessed to the shootings for which Plaintiff was wrongfully convicted. Mr. Taylor revealed for the first time that nefarious members of the Medellin Drug Cartel of Colombia, i.e. Ceasar Vallejo sent Mr. Taylor to perform the shootings. (See attached Appendix H, as an offer of proof). Furthermore, Plaintiff presented an affidavit of Private Investigator Julianne Cuneo, who stated she is a veteran investigator, she investigated the case for which Plaintiff was convicted, and in her near twenty years experience, she is firmly convinced that Plaintiff is innocent, and that Mr. Taylor committed the shootings. Indeed, P/I Ms. Cuneo accepted Plaintiff's case pro-bono after the identity of the real murderer became known. (See attached Appendix I, as an offer of proof). Moreover, independent investigation revealed that members of Ceasar Vallejo's enterprise were busted on November 8, 1990, as alleged by Mr. Taylor. (See attached Appendix J, as an offer of proof). In fact, the Vallejo network were responsible for pumping more than 220 pounds of cocaine a month in the City of Detroit. (See attached Appendix K, as an offer of proof). Additionally, Mr. Taylor personally informed P/I Ms. Cuneo that he left a Pepsi Cola bottle at the crime scene, and P/I Ms. Cuneo obtained evidence withheld from by the State which showed the Detroit Police Evidence Technicians obtained two fingerprint lifts from a Pepsi Cola bottle on the night of the shootings. (See attached Appendix L, as an offer of proof).

14. Armed with the above information, Plaintiff prepared a motion for relief from judgment, and filed it on June 12, 2003, in the Third Judicial Circuit Court. (Docket No. 91-07478).

15. Meanwhile, in August of 2003, Plaintiff began constructing an amended/supplemental motion for relief from judgment predicated on the grounds that the trial court was permitted to grant a new trial at any time where

6

justice had not been done under MCL 770.2, and the trial court was not constrained by the restrictive hurdles of MCR 6.508(D).

16. Then, on September 1, 2003, Plaintiff received by way of first class mail a second standard manilla legal size envelope stuffed with items and postmarked from Detroit, Michigan with a return address from Wayne County Prosecutor's Office, Frank Murphy Hall of Justice, 1441 St. Detroit, Michigan, 48226. Upon inspection, startling information was disclosed by an unidentified representative of the Wayne County Prosecutor's Office that significantly bolstered Plaintiff's claim of new evidence of his actual innocence, established that crucial evidence had been withheld, and greatly increased Plaintiff's chances for the order of a new trial. In particular, there was a cover letter from an unidentified member of the Wayne County Prosecutor's Office, which stated: "Dear Mr. Libby: Enclosed for your use are documents that were previously withheld from you in your 1992 criminal trial proceedings, and contained in a non-disclosed file of the Detroit Police Homicide Section labeled "Miscellaneous File". A "Miscellaneous File" was created in every homicide case under the former command of now retired Inspector Stewart, and not disclosed to the defense. Many of these documents are part of a greater file created by other government agencies involving their criminal investigation of you. I'm sure you'll make good use of all this. I'm compelled to withhold my identity at this time, because I could lose my job in doing this."

17. The materials provided were a laundry list of critical documents never previously disclosed to Plaintiff in his 1992 trial proceedings. In particular, the mailing provided:

    a) A list of Evidence Property in Detroit Police Homicide File 90-543, Evidence Tag No. 794934, Confiscated by Officer White, from deceased James Bargainer's front pants pocket, 1 yellow piece of paper with a name referencing Ceasar Vallejo, and phone number

7

being 270-5163.

b) A Detroit Police Department Witness Statement/Case Progress Report, subject John Green, Social Security No. 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, Bus. No. 527-0709, Statement taken by Sgt. A. Lovier, DPD Homicide File No. 90-543, dated January 4, 1991, indicating John Green was questioned about the contents of a name and number belonging to Ceasar Vallejo found on Mr. Bargainer on the night of the shooting. During the interview, John Green admitted to knowing Ceasar Vallejo and that he personally let Tim Taylor into his house on November 8, 1990 at the direction of Ceasar Vallejo. Mr. Green was also asked about the contents of a package that looked like a kilo of cocaine found in his basement, and he readily admits that Mr. Taylor brought it there. Likewise, Mr. Green was asked about the contents of blood evidence matching that of Mr. Bargainer found in the back hallway of his home, and readily admitted to having helped Mr. Taylor move the body of the deceased from the back hallway to the loveseat in the living room.

c) A Detroit Police Department Detective Summary Report prepared Sgt. Gene Ekaut, subject Roger E. Johnson, Social Security No. 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, summarizing Roger E. Johnson was a confidential informant recruited through both Detroit Police Department and Redford Police Department, after several firearms, and narcotic violations, including a 9 ounce seizure of cocaine off 6 Mile Rd. in Redford, Michigan. Roger E. Johnson was debriefed concerning Plaintiff and John Green, and personally wore a wire recording conversations with John Green after the November 8, 1990 shootings, and John Green stated during those conversations that the Colombian's had him and Mr. Bargainer shot.

d) A stack of various, reports, memorandums, agent summaries, and data by members of the Alcohol Tobacco and Firearms; U.S. Department of Justice, Drug Enforcement Administration; Michigan State Police; Oakland County Sheriffs Department; and Redford Police Department listing that Plaintiff was under continued surveillance starting in early 1990 up until Plaintiff's arrest of June 25, 1991. The reports reflected that law enforcement personnel used cam-corders, photography, aerial methods, moving surveillance, undercover purchases, transactions, eavesdropping equipment, and informants, for purposes of identifying suspects involved in firearms, explosives, and controlled substance activities resulting in the search of Plaintiff's suspected residence at 708 Alvin St. in Westland, Michigan, netting no evidence of criminal activity. There were other reports, information, and data that indicated they raided another suspected residence of Plaintiff at 15867 Virgil in Detroit, Michigan on July 5, 1990, resulting in the discovery of 1 AK-47 Auto Rifle, 1 riot 12 gauge shotgun SPA, suspected explosive materials, and suspected narcotic evidence. Additionally, there was a report indicating that on November 8, 1990, Plaintiff was under continued surveillance and was observed frequenting the home of 708 Alvin, in Westland, Michigan on November 8, 1990 at 5:00 p.m. with an unidentified female occupant. Subject left at 11:15 p.m.

e) 1 large (approx. 5 inch X 8 inch) surveillance photo of three men. 1 Latino, 1 white, and 1 black. The trio were standing behind a new white Ford Mustang convertible (license plate no. 173 VHE) located at a parking lot near Tel-Twelve Mall in Oakland County, MI. There was an attachment authored by FBI S/A Cathy Schroeder, reporting that subjects in the photo were identified as Ceasar Vallejo, Timothy Taylor, and Thomas/John Green.

f) FBI/DEA memos indicating Edgar and Ceasar Vallejo have flooded Detroit with hundreds of pounds of cocaine per month, and the huge influx has started a drug war between several Detroit drug lords, including the deaths of Demetrius Holloway, Richard "Maserati Rick" Carter, Dexter Washington, and others. Further, there was a DEA memo stating Edgar and Ceasar were active CIA operatives and should be afforded amnesty as they were needed for intell. gathering on major subjects involved in supplying cocaine, arms, and murdering or plotting to murder American government officials, including a plot to murder Consuelo Sanchez Duran who resigned from the bench in Colombia on August 20, 1988 and fled to America and was appointed as Colombia Consul in Detroit, and living at the Riverfront Apartment Complex in Detroit, after having a 1 million dollar bounty placed on her for indicting reputed drug lord Pablo Escobar for the murder of Guillermo Cano, a Colombian newspaper editor. Similarly, the memo stated the Vallejo's were needed for intell. involving a Las Vegas, NV. murder of former drug lord/Attorney Lee Chagra found murdered in his office, and for intell. on a major smuggler and investor named Ramon Puentes who was said to have a vessel loaded with cocaine named "GOOD LUCK" leaving Colombia and destined for Spain in November 1990 where Inspector Valdomoro of the Spanish Police would have BOL posted.

g) A U.S. Customs S/A memo authored by Timothy Bethel indicating that as instructed, Ceasar Vallejo was deliberately lost on surveillance in Ohio in order to facilitate a CIA amnesty request regarding future operations of national security.

18. The foregoing facts were salvaged from fragmented notes compiled during the construction of Plaintiff's initial amended 6.500 motion.

19. Armed with the above information showing critical information had been withheld, Plaintiff shuffled to finish his amended 6.500 motion arguing that MCL 770.2 should control the outcome of his case, and augmented his pleading with a new issue that the State violated due process in withholding material evidence. This pleading was prepared and ready for filing on 9/15/03.

20. However, on 9/15/03, at approx. 11:55 a.m. Plaintiff exited his cell and went to Unit 1 day room to get a table so he could make sure his

9

papers, exhibits, and everything therein were in order, and was stopped at the officers desk by Defendant RUO Hallowell indicating she wanted a shakedown. At the time, Defendant RUO Hallowell inquired as to the material Plaintiff had in his hands, and Plaintiff explained that it was his legal work concerning his amended 6.500 motion, his innocence, and it was really none of her concern. Defendant RUO Hallowell was visibly agitated, indicating the card-board priority mail envelope containing the papers was contraband as it was a fire hazard, and she had to confiscate it. Plaintiff asked if he could retrieve his papers inside and Defendant RUO Hallowell stated he could not. Plaintiff then requested a Contraband Removal Record, and was told he would get one when she feels like it. Plaintiff was then ordered to leave the desk or go to the hole for DDO. Thus, Plaintiff's only copy of his amended 6.500 motion with exhibits augmenting Plaintiff's motion was arbitrarily taken.

21. Prisoner Jose Prado was Plaintiff's cellmate, and personally seen the 9/1/03 government records "delivered" to Plaintiff by way of regular mail round, and even seen that Plaintiff's amended 6.500 motion was ready for filing on the morning of 9/15/03, when Defendant RUO Hallowell stopped Plaintiff at the desk, shook him down and took the cardboard priority envelope containing Plaintiff's legal papers. Further, prisoner Ron Gerrior personally observed Defendant RUO Hallowell stop Plaintiff at the desk, and shake him down while taking the legal package in the process.

22. Defendant RUO Hallowell then wrote Plaintiff a minor misconduct ticket for possession of contraband suggesting it was a fire hazard. The minor misconduct was observed by Plaintiff when he spoke with ARUS Barbier on September 15, 2003, at approximately 2:15 p.m. requesting return of his legal papers. The minor misconduct ultimately disappeared along with

Plaintiff's papers. Plaintiff was told by ARUS Barbier his papers were likely downstairs and that a Hearing would have to be conducted by RUM Love.

23. On September 16, 2003, at approximately 3:30 a.m. Resident Unit Officer Mr. Wilhour came into Plaintiff's cell telling Plaintiff he would have to pack up and move because Defendant RUO Hallowell did not want him in Unit 1 anymore. As a result, Plaintiff was packed and sent to Unit 2, despite there being a long waiting list to move out of Unit 1, which Plaintiff was not even on. Yet, Plaintiff was bumped to the "top" of the list for Unit transfers, and moved per request of Defendant RUO Hallowell. The actions of Defendant RUO Hallowell seemed to have been motivated by Plaintiff's posting of negative block-rep issues surrounding her arbitrary actions in the unit, grievances for others, and complaining she was unfit for duty.

24. After initiation of grievance proceedings, all requests for return of the legal papers were received with denials of any wrong doing, including the disappearance of the minor misconduct.

25. On or about October 23, 2003, prisoner George Zapantis # 187652, stepped from his cell, to the water fountain in MCF Unit 1. Mr. Zapantis overheard Defendant RUO Hallowell speaking to ARUS Barbier saying that she wrote Plaintiff a minor misconduct on the day he moved out to another Unit. Defendant RUO Hallowell stated that it wasn't logged and asked ARUS Barbier if he remembered it. ARUS Barbier stated vaguely but wasn't for sure. She then said well I've got to find out or rewrite this ticket because he's following through with a Step II Grievance on the situation. Defendant RUO Hallowell stated that guy's always crying about this, that or the other. She then seen Mr. Zapantis and closed the ARUS's door.

26. In early November 2003, Plaintiff's 1st cousin (Shelly Kohari) sent in a visitor's application for processing in order to visit with Plaintiff

11

who Plaintiff was raised with, and had not seen in nearly a decade. However, on November 12, 2003, Mr. Winburn was told by ARUS Johnson that Shelly Kohari was denied permission to visit per Inspector C. Clay because he had reason to believe that Plaintiff was involved in organized crime with members of a drug cartel, and Shelly Kohari was a drug dealer. Plaintiff said that was false, and indicated the only way Inspector C. Clay would be able to say anything like that is if he was privy to information contained in the legal papers that were taken in September. ARUS Johnson had nothing else to offer.

27. Under Administrative Rule 791.6609(2)(f) only the "Warden" was at liberty to deny placement of anyone on a prisoner's approved visitor's list. See also MDOC Policy Directive PD 05.03.140(K). Moreover, the Warden shall advise the appropriate Regional Prison Administrator in writing whenever a person is denied placement on a prisoner's approved visitors list and shall include the basis for denial. PD 05.03.140(K). This was not done.

28. On November 13, 2003, Plaintiff seen Inspector C. Clay exit the front of the LTA Building near the front doors, and inquired into why he denied Plaintiff's visit request with Shelly Kohari. Inspector C. Clay stated "that if you f___ with my staff with grievances that's what you get. You're both drug dealers, and I got a zero tolerance policy around here, so write a grievance if you want to". Inspector C. Clay then walked away. This incident took place in front of prisoner James Lang # 212262.

29. With regard to Plaintiff's criminal proceedings, Plaintiff had no means to reacquire and recreate the original government records, and was unable to supplement/amend and augment his motion for relief from judgment, which was pending in the Third Judicial Circuit Court.

30. On November 14, 2003, Plaintiff's original motion for relief from judgment was summarily dismissed without even a hearing because the trial

court found Mr. Taylor's confession to the crime was inherently incredible. Without the amended/supplemental motion for relief from judgment with critically necessary "corroborating records", Plaintiff's new evidence of innocence rested solely on the confession of Mr. Taylor.

31. Had the trial court been presented with the September 1, 2003 documents taken by Defendant RUO Hallowell, Plaintiff would have unquestionably prevailed, since he would have had government evidence that bolstered Mr. Taylor's confession.

32. Without the September 1, 2003 government records, Plaintiff has been irreparably injured.

33. Lastly, Plaintiff notes that after the discovery of the new evidence of the Vallejo network's orchestration of the murder, Ceasar Vallejo is believed to have been busted a second time in Oakland County, Michigan with more than 23 million dollars worth of cocaine using the alias name of Cesar Valasquez # 416077. Since Plaintiff has pressed forward with the newly discovered evidence, Plaintiff has been stabbed in his back, received personal threats of reprisal, death threats, and information that there is a $50,000.00 dollar contract on his life. As a result, Plaintiff has been placed in high profile protective custody.

### Count I

34. Plaintiff repeats and realleges paragraphs 7 through 33 as if fully set forth herein.

35. Plaintiff brings this claim for violation of the rights to access to the courts and impeding Plaintiff's rights to petition the government for redress of grievances guaranteed to him under both the First and Fourteenth Amendments to the United States Constitution.

36. Defendant has acted with deliberate indifference to the First and

Fourteenth Amendment rights of Plaintiff in the unjustified taking of his legal papers which were prepared and ready for filing.

37. As a direct, proximate result of Defendant's acts or omissions, Plaintiff's First and Fourteenth Amendment rights have been directly violated. By those same acts and omissions, Defendant has acted under color of State law to deprive Plaintiff of his constitutional rights in violation of 42 U.S.C. § 1983.

## IV. Relief

38. Plaintiff demands a trial by jury, and seeks monetary, punitive, compensatary, and nominal damages in excess of $100,000,000.00 dollars for abridging his fundamental right of access to the court, and causing irreparable damage to his judicial proceedings. Plaintiff further requests appointment of counsel, and commencement of discovery proceedings prior to a premature determination of his pleadings.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: August, 12, 2004

Robert Winburn a/k/a Scott Libby # 222196
Bellamy Creek Correctional Facility
1727 W. Bluewater Hwy.
Ionia, Michigan 48846

JURY TRIAL DEMAND

Plaintiff request a trial by jury.

Dated: August, 12, 2004

Robert Winburn a/k/a Scott Libby # 222196

14