# APPENDIX D

TO: Grievance Coordinator                                November 22, 2003

From: Robert Winburn

    Please forward me a Step I, or III grievance form so that I may file a grievance against you for violating my first amendment right to petition the government for redress of grievances by your arbitrary failure to forward me a grievance for filing a legitimate complaint against Ins. Clay.

Sincerely,

*[signature]*

Robert Winburn # 222196

cc: file

Robert Winburn

A P P E N D I X  E

# PRISON LEGAL SERVICES OF MICHIGAN, INC.

Sandra L. Girard
Executive Director

3855 Cooper Street
Jackson, MI  49201-7517
(517) 780-6639
Voice Mail: (517) 780-6470
FAX (confidential): (517) 780-5887
FAX (confidential): (517) 787-0014
E-Mail: plsminc@ameritech.net

August 21, 2002

A. Peter Govorchin             **Sent by FAX (517) 335-7157**
One Michigan Ave., #300
P.O. Box 30217
Lansing, MI  48909

RE:   Follow-up to my 8/14/02 letter regarding MCF's grievance practices.

Dear Mr. Govorchin:

On 8/14/02, I sent you a fax and letter about what appeared to be the unwarranted modified grievance status of a prisoner at MCF. I subsequently received the attached documents about another questionable case of modified grievance status. I may have others to forward in the near future. Due to the number and similarity of these complaints, we decided to analyze the Department's grievance data obtained through our discovery request last year. The data reveals that MCF rejects grievances at an alarming rate.

Out of 87,000 total grievances filed throughout the state between 9/5/00 and 9/4/01, 24% were rejected. Yet, over 46% of the 1,022 grievances filed at MCF were rejected -- nearly twice the average, and more than twice the median rate of 21%. Over a dozen prisoners had rejection rates of 15% or less. Neither the size of the prisoner population, the security level, nor the number of grievances filed per prisoner explain MCF's high rejection rate. Only 19% of the 6,174 grievances filed at LMF were rejected, even though LMF has less than half the number of prisoners (9,023 were filed at AMF and only 21% were rejected). Every level II and IV prison of similar size (about 1,300 prisoners) had lower rejection rates, regardless of the number of grievances:  ARF (2,444 grievances, 30% rejected), MRF (1,025/24%), LRF (2561/24%), RMI (3,857/11%).

MCF's high rejection rate magnifies the practice of placing prisoners on modified grievance status based on the number of rejected grievances, resulting in an unwarranted number of modified grievance sanctions. There is a perverse logic to MCF's approach: The more grievances rejected, the more prisoners placed on modified grievance access, and the lower the number of grievances overall.

This appears to be the only explanation for Steven Horowitz's modified grievance status. As in the case described in my 8/14/02 letter, Warden Carson did not specifically identify

*- providing legal services and training for prisoners since 1976 -*

*See reverse side* ↓

the four grievances in his memo. However, he asserted that, "One was rejected as you were attempting to grieve policy, two were rejected as a Warden's Forum issues and finally, one was rejected as it was duplicative." The four grievances are attached.

The first grievance (MCF02050041427B), rejected for "attempting to grieve policy," was filed to appeal an administrative hearing decision upholding the rejection of a magazine that contained an air freshener insert (see attached hearing report). As you are probably aware, free samples are commonly inserted in magazines with advertisements, and often fall out of their own accord. They certainly require no effort to remove. In any case, whether or not staff properly rejected the magazine in its entirety, the prisoner had a <u>right</u> to appeal the hearing decision by filing a grievance, pursuant to paragraph RR of PD 05.03.118: "A prisoner who disagrees with the outcome of a hearing may file a grievance as set forth in PD 03.02.130 'Prisoner/Parolee Grievances.'" Placing prisoners on modified grievance status for appealing hearing decisions will chill any efforts to exercise that right.

The second and third grievances (MCF02060047527E and MCF02060048827E) were rejected "as Warden's Forum issues," i.e., issues which affect a significant portion of the prisoner population. The grievances alleged that MCF's Food Service Director violated PD 05.03.150 by failing to provide <u>Mr. Horowitz</u> a kosher diet necessary for the observance of <u>his</u> religion. Mr. Horowitz was grieving a violation of PD 05.03.150 that directly affected <u>him</u>, something he is entitled to do, pursuant to paragraph E of PD 03.02.130: "Grievances may be submitted regarding alleged violations of policy and procedure or unsatisfactory conditions of confinement which directly affect the grievant." The rejection of these grievances was no less absurd than the rejection of the state-issued clothing grievance noted in my 8/14/02 letter.

Although the fourth grievance (MCF02060048928A) may have been properly rejected for raising the kosher diet issue again, it was certainly not a sufficient basis, by itself, for placing Mr. Horowitz on modified grievance status.

Please ask Warden Carson to review the decision to place Mr. Horowitz on modified grievance status. Unless there is additional information concerning the first three grievances that I am not aware of, the decision should be set aside. I hope the 2001 grievance data will be given careful consideration by your client, not only in this case, but in the case of the prisoner noted in my 8/14/02 letter. Please let me know the results of your efforts.

Sincerely,

PRISON LEGAL SERVICES OF MICHIGAN

Sandra Girard, Executive Director

# A P P E N D I X  F

MEMORANDUM

*Inv. + Rpt.*

WAYNE COUNTY PROSECUTOR'S OFFICE

**MEMO ON JAIL INFORMANTS**

TO: Richard Padzieski,
Chief of Operations

FROM: Robert Agacinski,
Deputy Chief, P.R.O.B.

DATE: February 8, 1995

SUBJECT: <u>POLICE USE OF PRISONERS TO OBTAIN CONFESSIONS</u>

---

I have been approached by several attorneys (Mary Ellen O'Connell, Dawn Ison, Robert Slameka) who have informed me of the practice of some police investigators to place prisoners on the 9th floor of 1300 Beaubien (the prisoner lock-up) in the expectation that they will overhear confessions of other suspects and testify to these jailhouse confessions in court.

There are three separate issues that should concern us.

First, if the "snitches" initiate the conversations that lead to confessions, <u>Miranda</u> is violated since these prisoners are acting as police agents.

Second, promises of leniency are made to these snitches without our approval - or prior knowledge - which exceeds police authority and violates our policies.

Third, I have been told that the snitches do lie about overhearing confessions and fabricate admissions in order to obtain police favors or obtain the deals promised.

Mary Ellen O'Connell presented me with the case of her client, Johnathan Davis, AKA, John Huet who has three separate robbery cases pending. She said homicide (Squad 7) transferred him to the 9th floor of the police station to obtain confession. She said he reported hearing three--one of which was a fabrication. [Tom Beadle has this last matter and believes Mr. Huet (Davis) indeed is lying about that confession--the sole evidence against that defendant.]

Dawn Ison talked to me last week about a client, Solomon Tolbert, charged with Robbery Armed and promised a sentence of 1-20 years for his cooperation. He has been taken by Royce Alston of the Violent Crimes Task Force to Burger King and other places in order to cooperate with the police. No promises were made to this defendant by our office.

Finally, Bob Slameka introduced me to two men (Joe Twilley and Oliver Cohen--now deceased) who were kept as police prisoners on the 9th floor and obtained confessions in several cases I am aware of, including a case I personally tried last month. Dale Collins and Bill Rice of DPD Homicide asked us to have Mr. Twilley's sentence on a murder conviction reduced. We wouldn't. They personally went to Judge Shamo and talked with him in chambers, and then later, Judge Shamo granted a "<u>pro per</u>" motion for a new sentence.

Again, this is a very dangerous area, best accomplished with undercover officers (which the police likely will not wish to do) than "prisoner snitches" who have been promised something (and if that promise is not disclosed to us we are looking at automatic reversal on any conviction).

Besides discussion of the matter with the police department, I would suggest in the meantime that any case which depends on a jailhouse statement made to a fellow inmate be very carefully scrutinized.

10a

## BAUGHMAN MEMO

### MEMORANDUM

DATE:   March 1, 1995

TO:     RICHARD J. PADZIESKI
        Chief of Operations

FROM:   TIMOTHY A. BAUGHMAN
        Chief of Research, Training
        and Appeals

RE:     PRISONER "SNITCHES"

The situation described by Agacinski, if true, could cause tremendous problems, not the least of which the police have no authority to make "deals" with prisoners in exchange for them acting as "listening posts." Further, several years ago at Shanty Creek federal judge Steven Trott, formerly with the Justice Department, gave a lecture regarding use of "snitches," which included a horror story of false testimony regarding supposed inmate "confessions" to snitches "compensated" for their testimony (and this in cases where the prosecutor was aware of the arrangements). This is a very dangerous area, ripe for false testimony, and if unauthorized consideration is promised to the "snitch," not only is that a problem in terms of lack of police authority, but where that consideration is not communicated to the prosecutor, and then disclosed to the defense for proper cross-examination, any conviction would be subject to prompt reversal.

Practical problems aside with this sort of testimony, the law is that once the defendant has an attorney, planting an informant in defendant's cell and encouraging him to elicit information is a violation of th right to counsel. United States v Henry, 447 US 264, 100 S Ct 2183, 65 L Ed 2d 115 (1980). If the informant is not encouraged to elicit information, rather is advised to act only as a "listening" post, there is no Sixth Amendment violation, Kuhlman v Wilson, 477 US 436, 106 S Ct 2616, 91 L Ed 2d 364 (1986), but one must not only accept the word of the informant that the statements were actually made by the defendant, but that the informant did not elicit them. Finally, while a defendant who is represented by counsel cannot be cajoled into a conversation with an inmate informant to discuss the details of the crime for which he is charged, but if the defendant were speaking of future or other crimes (threatening witnesses), the rule would not apply. Maine v Moulton, 474 US 159, 106 S Ct 477, 88 L Ed 2d 481 (1986)