A P P E N D I X   G

# TWILLEY MOTION

## STATE OF MICHIGAN

### IN RECORDER'S COURT FOR THE COUNTY OF WAYNE

THE PEOPLE OF THE STATE OF MICHIGAN,

        vs.                            Case No. 87-009820

JOE TWILLEY, JR.,

             Defendant.

_____/

### MOTION FOR RELIEF FROM JUDGMENT
### (IN CAMERA HEARING)

BEFORE THE HONORABLE M. JOHN SHAMO
RECORDER'S COURT JUDGE

Detroit, Michigan - Wednesday, July 27, 1994

APPEARANCES:

For the People:      ROSEMARY GORDON (P33275)
                      Wayne County Prosecutor's Office
                      1441 St. Antoine, 12th Floor
                      Detroit, Michigan  48226-2302
                      (313) 224-5777

For the Defendant:  MARY ELLEN O'CONNELL (P30482)

Court Reporter:      JANICE I. PAYNE, CSMR 3521
                      (313) 834-2400

## TABLE OF CONTENTS

WITNESS:                                                                    PAGE

    SERGEANT DALE COLLINS

        Direct Examination by Ms. O'Connell        4

        Cross-examination by Ms. Gordon        5

EXHIBITS:

    None

**2**     13a

1                       Detroit, Michigan

2                       Wednesday, July 27, 1994

3                       (All parties present.)

4             THE COURT: This is file number 87-9820;

5    People versus Joe Twilley, Jr. It's a Motion for

6    Relief From Judgment, which is really from sentence, to

7    reconsider the sentence.

8                   Is that basically it, Ms. O'Connell?

9             MS. O'CONNELL: Yes, your Honor.

10           THE COURT: Your name for the record?

11           MS. O'CONNELL: Mary O'Connell on behalf of

12    Joe Twilley.

13           MS. GORDON: Rosemary Gordon, Assistant

14    Prosecuting Attorney, appearing on behalf of the

15    People.

16           MR. COLLINS: Dale Collins, Detroit Police

17    Department Homicide Section.

18           THE COURT: Okay. Let the record reflect

19    that Deputy Burton is in the courtroom -- in the

20    chambers.

21              This hearing is going on in chambers.

22    It's a suppressed hearing. I don't want this

23    transcript released to anybody. And the defendant, Joe

24    Twilley, Jr. is present in the courtroom (sic); is that

25    correct, sir?

1              DEFENDANT-TWILLEY: Yes, sir.

2              THE COURT: Okay. We all agree that this

3     should be a suppressed hearing?

4              MS. O'CONNELL: That is correct.

5              MS. GORDON: Yes, your Honor.

6              THE COURT: Now, there's going to be some

7     sensitive issues from what I understand, and you may

8     proceed, Ms. O'Connell.

9              MS. O'CONNELL: Your Honor, I'd ask to call

10    as a witness as to what Mr. Twilley has done, Sergeant

11    Collins.

12             SERGEANT DALE COLLINS,

13           (Examined by Defense as follows:)

14             DIRECT EXAMINATION

15   BY MS. O'CONNELL:

16  Q   Sergeant Collins, could you tell us, basically, in what

17     manner Mr. Twilley has been of assistance to you?

18  A   Yes. Mr. Twilley, Defendant Joe Twilley has assisted

19     the Detroit Police Department Homicide Section on a

20     number of homicides in the City of Detroit. And he has

21     always cooperated in basically anything that we wanted

22     him to do. We have no objections to -- well, we go

23     along with whatever decision the Judge makes with

24     regard to release or not release.

25  Q   And this cooperation, did it require him to testify in

1    some of these cases as a witness?

2  A  Yes. He has testified in several cases, your Honor,

3    regarding homicides.

4  Q  Isn't it true that without -- one case recently, that

5    he was the main witness? And without him, that you

6    would not have been able to proceed on that case?

7  A  That is correct.

8  Q  Is there any other police departments that you're aware

9    of that has been assisted by Mr. Twilley? Any other

10    divisions in the Detroit Police Department?

11  A  Yes. There are some that I -- I understand there are

12    some. But I couldn't really testify to what he has

13    done. But my information is he has cooperated with

14    other agencies.

15  Q  Has he cooperated with the arson department?

16  A  Yes. To my knowledge, yes.

17        MS. O'CONNELL: I have no further questions

18    of the witness.

19        THE COURT: Ms. Gordon?

20        CROSS-EXAMINATION

21  BY MS. GORDON:

22  Q  Approximately how many homicide cases has he helped you

23    out with or given you information on?

24  A  I'd say at least twenty.

25        MS. GORDON: Okay. I have no further

5

15a

1   questions.

2         THE COURT: Okay. I have a statement and

3   then I have a couple of questions of Mr. Collins --

4   Officer Collins.

5         Officer Collins has been known to this

6   Court for almost twenty years as a reputable, reliable,

7   and good police officer, honest and trustworthy. His

8   word is well-accepted by this Court. He's been known

9   to me for so long.

10        So, his statements on this record are

11   beyond question, as far as this Court is concerned.

12   And if anyone wants to look at that, they could take

13   that into consideration, and any other reviews of

14   Officer Collins' reputation and integrity.

15        And the other officer that was here with

16   you the last time that talked to me, was that Sergeant

17   Rice?

18        SERGEANT COLLINS: Yes.

19        THE COURT: Okay.

20        SERGEANT COLLINS: Sergeant Rice, now

21   Lieutenant Rice.

22        THE COURT: Oh. Well, tell him I said

23   congratulations. And he also informed me a little bit

24   of what was going on before, about a month or so ago

25   when we had a private discussion between me and

8

17a

1    Lieutenant Rice and Sergeant Collins. And I think Ms.

2    O'Connell was here at that time. And I don't remember,

3    but I think a prosecutor was here too. Michael Cox I

4    believe was here at that time.

5           So, but, in your opinion, Sergeant

6    Collins, is Mr. Twilley's health at stake?

7           SERGEANT COLLINS: Yes.

8           THE COURT: Because of what he has done for

9    the police department?

10          SERGEANT COLLINS: Yes.

11          THE COURT: And as I stated earlier, I trust

12    you one thousand percent.

13          He's done approximately, what, seven

14    years or eight years of my sentence?

15          SERGEANT COLLINS: Yes.

16          THE COURT: And I know your answer, and I

17    know what Lieutenant Rice's answer was, and you

18    gentlemen wish me to reduce this sentence because of

19    his fear for his safety and health and his life, and

20    because of the cooperation he's given the police

21    department; is that correct?

22          SERGEANT COLLINS: That's correct, your

23    Honor.

24          THE COURT: And I think that this Court and

25    its wisdom should take all this into consideration --

**7**

1    and I gave him, what, twelve to twenty-five years at

2    the time -- by reducing it to a few years.  It would

3    save the gentleman's life.  For all the cooperation and

4    work he's done, I should do this, and I will do this.

5              And I think that this Court must take

6    into consideration all the factors involved that have

7    changed since it gave its sentence.  And one of the

8    factors is how well he's done within the prison system

9    with the Department of Corrections, what he has done to

10   redeem himself, and to cooperate with law enforcement,

11   and other factors that this Court must consider.  And I

12   am considering them.  And I will grant this request for

13   Relief from Judgment.

14             But I do think that I have to get an

15   updated presentence report to do it.  And I will have

16   it -- today is Tuesday?

17        MS. O'CONNELL:  The only concern would be

18   that there's nothing really new that the presentence

19   report could add.

20        THE COURT:  I'm going to have my aide do it,

21   and we'll have it by -- today is Tuesday?  We can do it

22   by --

23        MS. O'CONNELL:  Today is Wednesday.

24        THE COURT:  Today is Wednesday.  We can do it

25   by Friday.  Okay?  Tell Mary I want this done by

1   Friday.

2               And is there anything else I should add

3   to this, Ms. Gordon or Ms. O'Connell?

4               MS. GORDON:  I had a conversation with a

5   prosecutor by the name of Thomas Beadle who indicated

6   that Mr. Twilley was extremely helpful in a -- I

7   believe it was an arson/homicide that he prosecuted.

8   That it was Mr. Twilley's testimony that really made

9   the case for him.  That he certainly supports the --

10  you know, helping -- you know, consideration, and the

11  fact that he may very well be in danger because of the

12  consideration, and the fact that he has come to court

13  on numerous occasions.  It is my understanding from

14  people in the prosecutor's office.  And I think that's

15  a well-founded fear for his safety.

16              THE COURT:  Right.  And I think that this

17  Court would be remise in its function as a Judge in

18  this town not to take all of this into consideration.

19  And I have done similar actions in the past where a

20  person's life has been at stake.  And I'm always

21  willing to stick my neck out for people who are willing

22  to stick their neck out.  And the motion is granted.

23              We will resentence him on Friday.

24              MS. O'CONNELL:  Thank you very much, your

25  Honor.

9

1                    MS. GORDON:  Thank you, your Honor.

2                    (Proceedings concluded.)

10

2ia

# TWILLEY RESENTENCING

### STATE OF MICHIGAN

### IN RECORDER'S COURT FOR THE COUNTY OF WAYNE

THE PEOPLE OF THE STATE OF MICHIGAN,

        vs.                        Case No. 87-9820

JOE TWILLEY,

                Defendant.

_____/

### SENTENCING

#### BEFORE THE HONORABLE M. JOHN SHAMO
#### RECORDER'S COURT JUDGE

Detroit, Michigan - Friday, July 29, 1994

APPEARANCES:

For the People:      MICHAEL J. KING (P26781)
                    Wayne County Prosecutor's Office
                    1441 St. Antoine, 12th Floor
                    Detroit, Michigan  48226-2302
                    (313) 224-5777

For the Defendant:  MARY ELLEN O'CONNELL (P30482)

Court Reporter:      JANICE I. PAYNE, CSMR 3521
                    (313) 834-2400

# TABLE OF CONTENTS

WITNESSES:                                                    PAGE

    None


EXHIBITS:

    None

1       Detroit, Michigan

2       Friday, July 29, 1994

3       (All parties present.)

4       THE COURT:  File number 87-9820; People

5   versus Joe Twilley.  This matter is here for a sentence

6   today on a resentence.

7           State your name for the record, Counsel.

8       MS. O'CONNELL:  Your Honor, for the record,

9   Mary O'Connell appearing on behalf of Mr. Twilley.

10      THE COURT:  Mr. King, you're here for the

11  People?

12      MR. KING:  Your Honor, Michael King on behalf

13  of the People, and I'm standing in for Ms. Rosemary

14  Gordon.

15      THE COURT:  Thank you.  Okay.  Anything you

16  want to say before I pass sentence, Ms. O'Connell?

17      MS. O'CONNELL:  No, your Honor.

18      THE COURT:  Anything you want to say?

19      DEFENDANT TWILLEY:  No, your Honor.

20      THE COURT:  People?

21      MR. KING:  Your Honor, I understand Ms.

22  Gordon spoke to the Court and defense counsel, and I

23  have nothing to say.

24      THE COURT:  Absolutely.  We had a meeting the

25  other day on this.

3

1

2          Okay.  It's the sentence of this Court

3     on both counts is 1,818 days.  The first two years for

4     the felony firearm.  That would be like 704 days, I

5     believe.  And the balance is for the Count I.  And

6     they'll run consecutive to each other.

7          So, as far as this Court is concerned,

8     you're sentenced to a total of, including the

9     consecutive sentencing, of 1,818 days.

10          If I said concurrent before, I meant

11    consecutive.  Count I shall be consecutive to Count II.

12    And my staff will make arrangements for his discharge.

13    He doesn't have to return to the prison system.

14          You have a right to appeal this to a

15    higher court.  If you're without funds to hire a

16    lawyer, the Court will appoint one for you.

17          Sign the appeal rights form to show you

18    received a copy of it and return it to this court

19    within 42 days if you wish to appeal.

20          Okay.  Good luck to you, sir.

21          DEFENDANT TWILLEY:  Thank you, your Honor.

22          MS. O'CONNELL:  Thank you very much, your

23    Honor.

24          (Proceedings concluded.)

25

                        4

A P P E N D I X  H

Affidavit of Timothy Taylor

NOW COMES Timothy Taylor and for his affidavit states as follows:

1) I am currently an inmate at the Cotton Facility in Jackson, MI serving a life sentence.

2) In March of 2000 I met an inmate named Scott Libby and he told me he was serving time for a shooting that occurred in 1990 in the Detroit neighborhood Brightmoor, at Sunnyside and West Parkway.

3) After I talked to Scott Libby, I realized that the crime he is serving time for is a crime that I committed.

4) I have only talked to Scott Libby that one time.

5) I have never been given details of the shootings on 11/8/90 by anyone and all the information I have on the shootings is from my own personal knowledge because I committed the acts.

6) I had not known that anyone was arrested or convicted for this shooting, and as I thought it over I decided I wanted to set the record straight.

7) I wrote to the person who had introduced us and asked him to tell Scott Libby that I shot James Barganier and John Green on 11/8/90 and I am willing to admit that I was responsible for these shootings.

8) I have written a letter dated 8/26/01 in my own handwriting describing the events that lead to this shooting and the shooting itself, and I have signed each page with a notary present.

9) I am willing to testify truthfully to the events of 11/8/90.

FURTHER, Affiant sayeth not.

Under the penalty of perjury, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters stated to be on information and belief and as to such matters the undersigned certifies they believe the same to be true.

_____
Timothy Taylor

Subscribed and sworn before me, this
2nd day of February, 2002,
a Notary Public in and for Macomb County,
(acting in Jackson County) State of Michigan

Affidavit of Timothy Wayne Taylor #240141

NOW COMES Timothy Wayne Taylor and for his affidavit states as follows:

1) I am currently an inmate at the Cotton Facility in Jackson, MI serving a life sentence, (with a conviction which was under appeal) and if called to testify I can testify competently to the facts contained within this affidavit.

2) In March of 2000 I met an inmate named Scott Libby and he told me he was serving time for a shooting that occurred in 1990 in the Detroit neighborhood of Brightmoor, MI, at Sunnyside and West Parkway.

3) After I talked to Scott Libby, I realized that the crime he is serving time for is a crime that I committed.

4) I have only talked to Scott Libby that one time which lasted for a period of five or ten minutes.

5) I have never been given details of the shootings on 11/8/90 by anyone and all the information I have on the shootings is from my own personal knowledge because I committed the acts.

6) I had not known that anyone was arrested or convicted for this shooting, and as I thought it over I decided I wanted to get the record straight after having been conscience stricken and guilt ridden. It was kind of like a sign or something that I met Scott Libby on the anniversary day of my step-father's death which meant that I should come forward with the truth. I believe that I should come forward to be right with God. I have talked about this with a lot of people, including a Chaplain at Huron Valley and a Psychologist, and I feel that I should come completely clean regarding my knowledge, participation and involvement in the Sunnyside and West Parkway shootings.

7) The facts about my involvement became known when I wrote to the person (named Fred Proctor) who had introduced us and I asked him to tell Scott Libby that I shot James Bargainer and Slicky a/k/a John Green on 11/8/90 and I am willing to admit that I was responsible for these shootings. Even after providing this tip, at first I was reluctant to fully cooperate given the serious consequences involved in coming forward. I even refused prior scheduled interviews with Private Investigator David Holtz on at least two prior occasions.

8) I have previously written a letter dated 8/26/01 in my own hand writing describing the events that led to this shooting and the shooting itself, and I signed each page with a notary present. This affidavit essentially entails the contents of that hand written letter.

9) I am willing to testify truthfully to the events of 11/8/90.

10) Specifically, in 1990 I was engaged in a large scale drug trafficking operation (namely cocaine) with a drug-kingpin named Ceasar Vallejo who is a Colomoian from South America. His phone number was 270-5163. He would sometimes be accompanied by another Latino man named Sergio Rodriguez.

11) I became close to Ceasar Vallejo, even doing various drops/runs for him when requested to do so.

12) Ceasar Vallejo maintained a safe house at the Silver Brook Apartment Complex that I am aware of.

13) In July 1990 Ceasar Vallejo asked me if I would like to make some extra money, indicating that he needed someone to make some drops to a man by the name of Slicky a/k/a John Green who lived in the Detroit neighborhood of Brightmoor, MI at the corner house of West Parkway and Sunnyside.

14) Ceasar Vallejo indicated that the packages I dropped off would

be prepaid for and gave me directions to the house indicating that I should look out for a white Ford 5.0 Mustang with a red top. The first time I entered the home of Slicky a/k/a John Green, a young black male opened the door indicating that he was James Bargainer (a black male approximately 5 feet 8 inches tall, with glasses and a short fade hairstyle) at which time I asked to see Slicky a/k/a John Green.

15) I was then greeted by Slicky a/k/a John Green (a black male approximately 6 feet 1 inches tall with a geri-curl hairstyle) and he told me to follow him to the basement, in which I did so. (Business deals were conducted in the basement to avert listening devices by law-enforcement).

16) I then gave Slicky a/k/a John Green approximately three packages which were wrapped-up in silver duct-tape. John Green then placed those packages in a cabinet against the wall and I went back up the stairs and exited the home.

17) I made subsequent dropes to Slicky a/k/a John Green which involved similar actions to those described above. I seen that his girlfriend would sometimes have a BMW at the house.

18) In September 1990 Ceasar Vallejo informed me that everyone was being watched by the Federal Bureau of Investigation (FBI). At this point Ceasar Vallejo was very paranoid about everyone, even shaking me down for wires and whatnot.

19) In November 1990 I called Ceasar Vallejo to acquire a kilo of cocaine and he indicated that his brother Hugo Vallejo had just been busted at the Redroof Inn, in Troy, MI., and that James Bargainer and Slicky a/k/a John Green had to be killed before the FBI were able to connect them to him. (Apparently fearing they would snitch).

20) I was informed by Ceasar Vallejo that he had it all preset with

Slicky a/k/a John Green for me to shoot and kill James Bargainer, but unbeknown to Slicky a/k/a John Green, I was to also kill him in the process. (Leaving them both for dead).

21) Ceasar Vallejo told me that in order to accomplish this task he was sending a person to the Winston Motel with a package around 8:45 p.m., November 8, 1990.

22) I then met a man who brought me a large package wrapped in silver duct tape and a phone/pager number with instructions to call it six or seven times after I complete the killings so that I would overflow the beeper and erase all numbers on the beeper linking Ceasar Vallejo to Slicky a/k/a John Green.

23) I checked my .380 pistol and proceeded over to Slicky a/k/a John Green's home shortly thereafter, and upon arrival both Slicky a/k/a John Green and James Bargainer were just pulling up at the same time. I then informed Slicky a/k/a John Green that I had a package for him from Ceasar Vallejo and I was invited into the house and Slicky a/k/a John Green and I proceeded to the basement (leaving James Bargainer upstairs) at which time I gave Slicky a/k/a John Green the silver duct tape package which he took and put in the cabinet down there.

24) Slicky a/k/a John Green then told me to go and take care of James Bargainer (meaning go kill him). I went up the stairs and when I got up there, James Bargainer was already standing in the back-hallway, at which time I pulled out my .380 pistol from my waistband and told James Bargainer to do what I say and I would not kill him. I told him to get down on his knees (which he did) and I shot him one time in the top of his head. James Bargainer's body immediately collapsed to the floor falling forward, at which time blood started leaking out of his head. In the process, Slicky a/k/a

John Green came up the stairs irate and yelling that I was supposed to shoot James Bargainer in the living room to make it look like someone came in the front door and shot James Bargainer from that vantage point.

25) I then told Slicky a/k/a John Green to calm down and that we could move James Bargainer's body to the living room on the loveseat. (Which we did). I then put James Bargainer's hand in his left pocket. The idea was to make it look like somebody came in the front door and surprised him. James was wearing a green coat. I also took the silver jacketed shell casing which had ejected from the pistol and placed it in the living room. (Staging the crime scene).

26) Slicky a/k/a John Green went into the kitchen to get some rags to clean up the blood which had leaked from James Bargainer's head onto the back hallway floor. (Slicky a/k/a John Green was wearing a down-type coat also because they'd just gotten home from Northland Mall, where they'd made a drop). I then pretended to be using the phone in the dining room, and when Slicky a/k/a John Green was in the kitchen with his back to me and turned to say somthing, I pulled out my pistol and shot him three or four times spinning him around where he went to the floor. I then walked over to him and fired a single round into the back of Slicky a/k/a John Green's head. I then started picking up the ejected shell casings putting one on the dining room table but I could not find them all so I just took the phone and exited the home using the front door.

27) After the shooting, I entered my green 1977 Ford LTD with a black top, and escaped in said vehicle from the scene of the crime. I proceeded down Sunnyside to Hazelton and made a turn going down to Ridge Road and I made a right starting to go around the curve and I pulled over my vehicle, got out, and went down a hill and discarded the pistol and a light colored

phone in the river. I then proceeded back to the vehicle, got in, and proceeded around the curve going to Six Mile Rd where I made a left hand turn on.

28) I then stopped at a payphone and called Slicky a/k/a John Green's beeper 6 or 7 times to overflow it so that the numbers would be erased. I then went back to the Winston Motel and called Ceasar Vallejo and told him that it was done. I never heard from Ceasar Vallejo after the night of the shootings. (After the shootings I had a tattoo done that is a sword and cross design with the letters TJS beneath it. They stand for Two: James, Slicky. The tattoo is approximately eleven years old).

29) After learning that an innocent man was imprisoned for this crime, I sincerely became conscience stricken and guilt ridden from the fact that through my own cowardice, an innocent man would continue to languish behind bars for a crime which I did.

30) I come forward voluntarily without coercion, threats, or compulsion.

31) I have no prior relationship to Scott Libby. At no time prior to coming forward did I speak to Scott Libby nor any other person concerning the intimate details of the crime. I know everything because I am the triggerman.

32) In honesty, I really was reluctant to come forward with the truth before I did so, because I feared criminal prosecution, and losing any chance of ever getting-out of prison. I do so now in the interest of justice, knowing full well that I subject myself to possible criminal penalties.

33) Upon a visit by Investigator Julianne Cuneo, I provided further information regarding things only the perpetrator would know. I explained that the house on Sunnyside and West Parkway had big windowpanes in the front with trees, and provided a hand drawn lay out of the inside of the home.

Page 7

34) If given an opportunity to be transported to the area of Brightmoor with a police escort, I could easily take any interested law-enforcement officer or other person straight to the crime scene, reenacting the crime as it occurred, and point-out the area where I discarded the murder weapon and phone.

35) Finally, after having stepped forward about my knowledge of the crime, I seen that Ceasar Vallejo may have been busted in January 2001, involving a 23 million dollar cocaine bust which was the biggest bust in Oakland County history. He was using an alias name which law-enforcement may not know who he really is. This bust was on the news and in the papers.

FURTHER, Affiant sayeth not.

Under the penalty of perjury, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters stated to be on information and belief and as to such matters the undersigned certifies they believe the same to be true.

_____
Timothy Taylor

Subscribed and sworn to before me
this 25th day of July, 2002

_____
Notary Public

ERNEST J. PAZITKA
NOTARY PUBLIC INGHAM CO., MI
MY COMMISSION EXPIRES Sep 8, 2004
ACTING IN JACKSON COUNTY, MI

### Affidavit of Timothy Taylor

NOW COMES Timothy Taylor and for his affidavit states as follows:

1) I am currently an inmate at the Cotton Facility in Jackson, MI serving a life sentence.

2) In March of 2000 I met an inmate named Scott Libby and he told me he was serving time for a shooting that occurred in 1990 in the Detroit neighborhood Brightmoor, at Sunnyside and West Parkway.

3) After I talked to Scott Libby, I realized that the crime he is serving time for is a crime that I committed.

4) I have only talked to Scott Libby that one time.

5) I have never been given details of the shootings on 11/8/90 by anyone and all the information I have on the shootings is from my own personal knowledge because I committed the acts.

6) I had not known that anyone was arrested or convicted for this shooting, and as I thought it over I decided I wanted to set the record straight.

7) I wrote to the person who had introduced us and asked him to tell Scott Libby that I shot James Barganier and John Green on 11/8/90 and I am willing to admit that I was responsible for these shootings.

8) I have written a letter dated 8/26/01 in my own handwriting describing the events that lead to this shooting and the shooting itself, and I have signed each page with a notary present.

9) I am willing to testify truthfully to the events of 11/8/90.

FURTHER, Affiant sayeth not.

Under the penalty of perjury, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters stated to be on information and belief and as to such matters the undersigned certifies they believe the same to be true.

_____
Timothy Taylor

Subscribed and sworn before me, this
2nd day of February, 2002,
a Notary Public in and for Macomb County,
(acting in Jackson County) State of Michigan

A P P E N D I X   I

State of Michigan
In the Circuit Court for the County of Wayne

Affidavit of Julianne Cuneo

NOW COMES Julianne Cuneo and for her affidavit states as follows:

1) I am a Private Investigator, licensed by the Michigan State Police, license number PD 2692.
2) I have been an investigator since 1982, first on staff at a law firm and as owner of a private investigation firm since 1988.
3) I have investigated the murder case for which Robert Winburn aka Scott Libby is serving time and I believe there is a real possibility that he is innocent.
4) Recently, I obtained an affidavit from a man stating that he is the person who committed the crime of which Winburn/Libby was found guilty.
5) The man supplied many details about the crime, answering questions about the crime with convincing directness and thoroughness.
6) The man agreed to testify truthfully that he alone committed this crime.
7) Although Winburn/Libby originally retained my services, I began working at reduced rates last summer when the identity of the real murder became known and currently I am working pro bono because Winburn/Libby's family has limited resources and I believe there is a good possibility that Winburn/Libby is innocent.
8) Given the new evidence available, I believe an attorney should be appointed to assist Winburn/Libby in pursuing post conviction relief.
9) I have never before written or signed an affidavit of this nature because I have never before felt so strongly about the likelihood that a specific innocent person had been wrongly convicted and incarcerated.

FURTHER, Affiant sayeth not.

Under the penalty of perjury, the undersigned certifies that the statements set forth in this instrument are true and correct.

Julianne Cuneo

Subscribed and sworn to before me

This 20th day of February 2002

Gay Amalfitano
Notary Public, County of Macomb